UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTIRCT OF TENNESEE

| UNITED STATES of AMERICA | ) | |
|---|---|---|
| v. | ) | Case No. 1:19-cr-146 |
| Karim SADRUDDIN | ) | Judge Travis R. McDonough |
| and | ) | |
| Rahim SADRUDDIN | ) | |

**DEFENDANTS KARIM AND RAHIM SADRUDDIN'S MEMORANDUM OF LAW IN SUPPORT OF DOWNWARD VARIANCE AND A NON-PRISON SENTENCE**

Pursuant to 18 U.S.C. §3553 and related authorities, Defendants, Karim and Rahim Sadruddin, by and through counsel, respectfully move for downward variances from their advisory guidelines of 70-87 months up to and including probation. In the alternative, they seek home confinement in lieu of incarceration. The Sadruddins have fully accepted responsibility for their actions and filed no objections to their Presentence Investigation Reports. The following statement of facts is meant to *supplement* and give context to those facts already discussed and admitted in the PSRs.

**Statement of Facts**

Karim Sadruddin and his twin-brother Rahim are thirty-five years old. Born in Karachi Pakistan, Karim and Rahim have been naturalized citizens since 2007 and live in the Atlanta, Georgia area. Living almost their entire lives in the United States, both Karim and Rahim are happily married with one and three minor children respectfully. The brothers are deeply committed family men – taking active and critical roles in the education and nurturing of their children. Karim graduated from high-school and completed approximately two-years of college

from Georgia State University. Rahim obtained a four-year undergraduate degree. He has no criminal history. The Sadruddins have not, and do not, drink alcohol or use non-prescription drugs.

*The Pikeville Project*:

Karim and Rahim were born into a family of textile manufacturers and distributors. Their father, Mansoor Sadruddin, has, throughout his career, been involved in the textile business, and until 2005, Mansoor Sadruddin owned and operated a textile manufacturing operation within the State of Georgia. Karim and Rahim worked in their family's textile manufacturing and distribution businesses and aspired to own and operate their own one day. Like offspring of many successful parents, Karim and Rahim wanted to make their mark early in life to prove that they too could carry on the family's tradition of success. Unfortunately, the Sadruddin brothers were in too much of a hurry and soon were in "over their heads."

For years, Karim and Rahm have distributed textile products, including those from Al Rahim Textile Industries of Pakistan, where they have long-standing personal and business relationships. (Based in Pakistan, Al Rahim is a large textile manufacturer/distributor, as well as a major exporter throughout the world.) In early 2017, Karim began to investigate launching his own textile manufacturing facility in the Southeast. His investigations included speaking with Al Rahim officials concerning a joint venture to include Al Rahim's financial backing and/or partnership. While some of the details may be disputed, Al Rahim provided Karim its audited financial statement for the fiscal year ending June 30, 2016 in relation to serious discussions regarding the opening of a textile manufacturing/distribution facility in the Southeast during the first half of 2017.

2

While investigating prospects with Al Rahim, Karim was introduced to Ed Cagle who touted his own experience in siting new manufacturing facilities and especially in the procurement of government incentives. Mr. Cagle owned and/or leased a private jet to travel and spent ostentatiously. He told Karim that he had been instrumental in many successful projects including the bringing of a Caterpillar manufacturing facility to South Carolina and Komatsu to Chattanooga and South Carolina. He further boasted that over the years he had many lucrative contracts with TVA. Mr. Cagle offered his services and suggested they explore opportunities, including in Tennessee where he said he knew and had previously worked with many important state officials. Karim accepted Cagle's offer of help, and they began actively collaborating to launch a textile manufacturing facility. Mr. Cagle would fly Karim to different sites as they investigated opportunities or met with consultants or prospective clients.

Nevertheless, Karim had continued to maintain communications with Al Rahim officials, and in late May 2017, Karim informed Al Rahim of options including facility sites in North Carolina, Georgia, and Tennessee. An Al Rahim representative invited Karim to join them in a possible venture in Georgia if the Tennessee venture did not work out. However, Al Rahim insisted that any venture would require Al Rahim to be the sole/dominant owner with Karim to serve as an employee or perhaps a minor equity owner. Karim desired at least an equal share and came to believe his/family prospects would be better served by collaboration solely with Cagle who offered connections, professed expertise in obtaining grants, an equal share in the business, as well as financial backing and/or sources.

Cagle did appear, in fact, to be well known to state officials and began negotiating directly with Gregg Ridley, the Bledsoe County mayor, as well as members of the Bledsoe County Industrial Development Board (IDB) about locating the facility in Pikeville. Cagle also

3

negotiated directly with Beth Jones and Todd Byrum of Tennessee's Department of Economic and Community Development (ECD) regarding state grants and other incentives. During these negotiations, Cagle described the general scope and nature of the operations which included rough estimates for employment and investment levels. Cagle decided on the numbers to "pitch" state officials in order to maximize the size of the grant, and in April, 2017, Karim and Cagle met with ECD and TVA representatives regarding the planned textile mill and represented that the project would bring 1,000 jobs and investment of between 18 to 21 million dollars in plant, equipment, training, and other related expenses. *See*, Information, R. 1, Page ID# 4-5.

In May 2017, Karim and Cagle collaborated in completing the state (ECD) incentives application seeking funding and other tax incentives for a textile manufacturing facility to be operated under the name Textile Corporation of America. (The application was signed by Karim only.) The application contained similar representations regarding employment and investment as made in April (1,000 employees and $27.1 million in investment by 2020), as well as falsely representing that Al Rahim was TCA's parent and financial backer. The Al Rahim financial statement described above was submitted in furtherance of this misrepresentation. Subsequently, Cagle negotiated with Joe Cadle of the ECD to increase the funding amount from an original offer of approximately $1.5 to $3.0 million. See, Exhibit 1.

Even without Al Rahim's financial backing, the Sadruddins had come to believe that with sufficient grant money and the auspices of their well-connected business partner, Ed Cagle, the manufacturing facility could still become a reality. All along, Cagle seemed to know what he was doing - and more importantly to have the blessings of important government officials. For instance, Cagle would soon add Troy King, the former state attorney general of Alabama

4

between 2004 and 2011, to the project's team.[1] Cagle assured Karim that government officials were not strict about how the grant money was spent as long as a viable business was created. He suggested grant money ear-marked for construction or equipment or training could be used for other purposes.

On or about June 2, 2017, the State of Tennessee approved the ECD grant application. As described in the PSRs, the grant provided *reimbursement* for purchase of the Pikeville property and other expenses related to bringing the facility online. (Cagle had already directly negotiated a sales price of $850,000 with the IDB for the Pikeville property.) With the grant in hand, Cagle instructed his attorney, Darrell Bridges, to file the necessary papers with the Tennessee Secretary of State to create Textile Corporation of America, L.L.C. ("TCA") with Cagle's office (4509 Highway 58 Chattanooga, Tennessee) serving as the principal place of business. (See, Exhibit 2). Cagle then directed Bridges to prepare an operating agreement providing equal membership for Cagle and Karim in TCA and retaining Cagle's own office as TCA's principal place of business. The operating agreement was signed on or about July 1, 2017 at Cagle's office. (See, Exhibit 3).

With no financial backing from Al Rahim Industries or any other ready source of funds (including Ed Cagle who said his funds were no longer readily accessible), Ed Cagle suggested a loan from his brother Charles in order to purchase the Pikeville property. Ed Cagle separately undertook to secure these funds, and on July 7, 2017, Ed Cagle and Karim signed a promissory note in favor of Charles Cagle in the amount of $850,000 along with a deed of trust to the

---

[1] Mr. King ran for Congress for the Second District of Alabama in 2020. More recently, Mr. King and his company Bear Mountain Development Co., L.L.C. were in involved in a nearly $800 million deal to provide masks and face shields to the State of California during the coronavirus pandemic. The deal collapsed as reported by the Los Angeles Times. https://www.latimes.com/california/story/2020-05-09/coronavirus-california-contracts-masks-bear-mountain?_amp=true.

5

Pikeville property – both of which were again prepared and witnessed by Ed Cagle's attorney Bridges. (An additional $100,000 was promised to Ed Cagle as a "finder's fee" and for accrued interest – making for a total lump sum payment of $950,000.) On this same date, the deed of trust in favor of Charles Cagle was filed in the Bledsoe County Register of Deeds, and TCA issued a check for $850,000 in full payment for the property.

Ed Cagle continued to direct much of TCA's activities including negotiating a ribbon cutting ceremony with Governor Haslam and other state and local officials. In fact, the Sadruddins were unaware of the proposed ceremony until just two days before. Cagle assigned Troy King to deliver the speech on behalf of TCA while directing the Sadruddins to be as unobtrusive as possible. On July 24, 2017, Governor Haslam, along with other elected state and local officials, as well as state economic development staff, traveled to Pikeville to attend the ceremony. Cagle even sent his private jet to pick up one TCA official who happened to be in New York at the time. The event was widely covered by media including the Chattanooga Times Free Press which included the following excerpts:

> Textile Corp. of America announced Monday it will make the biggest private investment ever in Bledsoe County, spending $27.1 million to buy and upgrade the vacant 186,000-square-foot factory building in Pikeville …
>
> The new company, which is owned by Chattanooga developer and businessman Ed Cagle, plans to start production of apparel, bedding and linens this fall. Officials said they hope to quickly increase the staff to 1,000 employees and begin hiring and training workers in the next month or so.
>
> "When it came time to bring textile manufacturing back to America again, this community was hands down the first choice," said Troy King, a former attorney general for Alabama who is chief legal counsel for the company. "We believe this represents the renaissance of America, the return of America as a global manufacturing center."
>
> The textile manufacturer will locate its headquarters on the 16-acre site here and install what it says is state-of-the-art machinery to produce industrial and institutional textile products, including apparel, kitchen linens and bedding for the healthcare and hospitality industries. The leadership of the new business has more

than four decades of experience working around the globe, and Cagle said in a statement he is eager to bring production back to the United States.

"We are proud to call Pikeville, Tenn., home to our new mill," said Cagle, owner of Cagle & Associates in Chattanooga and a builder of Family Dollar stores and other commercial projects across the country. "Millions of dollars of investment and the creation of thousands of jobs will be transformative for this county and region."

…

King said the new plant should be in production by October. "It's a very ambitious and aggressive timeline, but we're ready to go to work and ready to put people to work," said King, who said the company soon will begin screening applicants through the state's Career Centers. "If it is made out of cotton and textiles, we can make it here. We have a president who is putting an emphasis on "Made in America," and we think the timing is right for this now."



"Tennessee Gov. Bill Haslam, center, talks about the $27.1 million investment a new textile company is making in Pikeville to create 1,000 jobs. With Haslam, from left, are Pikeville Mayor Philip 'Winky' Cagle, Bledsoe County Mayor Gregg Ridley and Troy King, chief legal counsel for Textile Corporation of America." (Photograph from Chattanooga Times Free Press article https://www.timesfreepress.com/news/business/aroundregion/story/2017/jul/25/textile-mill-add-1000-jobs-pikevillebiggest-i/440002/.

After the ribbon cutting ceremony on July 24, 2017, TCA officials drove to Chattanooga for an organizational meeting at Cagle's Chattanooga office. During this meeting, those gathered discussed and agreed upon the terms of an operating agreement meant to supersede the original

8

mentioned above. The persons listed below attended and orally consented[2] to the following ownership interests and positions:

> Karim: 32.5%; CEO; Chairman
> Rahim: 32.5%; COO
> Cagle: 25%; President
> Donald Fiechter; 5%; Treasurer
> Troy King: 5%; Chief Legal Officer.

See Exhibit 4. In addition to being TCA's president and 25% owner, Cagle sought, and was permitted, to act as the general contractor for refurbishing and bringing the Pikeville facility online. On or about August 24, 2017, Cagle was paid an initial installment of $25,000 to begin renovating the Pikeville facility.

On October 3, 2017, Todd Byrum of the ECD was provided with TCA's first draw request against the state grant - including reimbursement of $850,000 for purchase of the property/facility and a separate invoice of $1,406,900 for purported renovations. In fact, little renovation had been completed by that time. "Proof of payment" for the renovation invoice included a false Cagle Development invoice and wire transfer prepared by Karim purporting to show that Cagle Development had performed, and been paid, for the renovations in said amount. A copy of the invoice was provided to Cagle. Cagle would subsequently report by phone to Karim that during a pre-payment walk-through to confirm progress at the Pikeville facility, a local official told Cagle that checks could be issued as long as the work *had begun*. Despite the clearly insufficient amount of work relative to the invoice, checks in the amount of $850,000 and $1,406,900 were approved and issued to TCA on November 8, 2017. Karim and Cagle drove to Pikeville to personally receive the checks which were deposited to TCA's account. A week later,

---

[2] The agreement was subsequently memorialized and signed.

TCA issued a check in the amount of $950,000 directly to Cagle Development for reimbursement of the $850,000 loan from Charles Cagle and a $100,000 fee/interest for the four-month loan.

On November 29, 2017, Karim submitted a second Cagle Development construction invoice to the ECD in the amount of $806,100 for purported work on the Pikeville facility – and received $728,100 (the remainder of the $3,000,000 grant less $15,000 for administrative expenses) for a total of $2,985,000 in state grant money. Again, the value of renovation to that point in time was much less than the invoice represented. The Sadruddins would ultimately, to the best of their knowledge, pay Cagle Development over $800,000 for construction work including materials – though they currently believe significantly less was actually used for those purposes.

As more fully discussed in the PSR, TCA also received $230,000 in TVA grant funds for worker training and equipment. Ultimately, the Sadruddins purchased ten sewing machines in or about November 2018 for $5,335 while also installing a new electrical grid, repairing large portions of the existing electrical system, and purchasing other furniture, fixtures and equipment. No product was manufactured before the project collapsed as discussed in "The Dissolution of the Pikeville Project" section.

*The Tarp Project*:

Not long after the terms of the second TCA operating agreement had been agreed upon (July 24, 2017), Cagle told Karim that the federal government would be needing tarps and other emergency related equipment/supplies for storm victims following Hurricane Harvey's August 25th landfall on Texas. Cagle directed Karim to source tarp suppliers while King procured a

10

FEMA contractor number for Master Group – a separate entity which predated TCA and was owned by Karim. Consequently, on September 1, 2017, Bear Mountain, L.L.C., an entity controlled by Troy King, and Master Group USA, L.L.C., managed by Karim, but now including Cagle as a member, entered into a memorandum of understanding to partner in obtaining and fulfilling FEMA storm related contracts. The MOU which was prepared by King/Bear Mountain provided that "[i]n exchange for Bear Mountain providing Master Group counsel and legal services" and its previous help in obtaining a FEMA contractor's number, Master Group agrees to pay Bear Mountain twenty-five per cent (25%) of net profits. Exhibit 5.

On September 20, 2017, Hurricane Maria hit Puerto Rico, and by November 1, the Sadruddins, in collaboration with Cagle, coordinated a bid application to FEMA to supply tarps. As stated by the PSR, the Sadruddins had originally attempted to obtain tarps meeting all specifications including point of origin. PSR, R. 56, Page ID# 411, ¶91. Unable however to find sources other than Chinese mainland facilities capable of producing the tarps under pending time constraints, the decision was made to use mainland Chinese sources by the Sadruddins, Cagle, Scott Shoffner, and Troy King. *Id*. Master Group was eventually awarded the FEMA bid worth $30.7 million dollars in the second week of November 2017.

On November 17, 2017 (the same day on which the first Pikeville deed of trust was released after payment of the "Charles Cagle" $850,000 loan), Ed Cagle, purporting to act as the "managing member" of both TCA and Master Group, signed a $1.4 million-dollar promissory note in favor of Whorisky, Inc. for the purpose of obtaining funds for additional tarp purchases. (Whorisky is a "high risk lender" from whom Ed Cagle had barrowed in the past and to whom, at the time, Cagle was in debt/arrears for his own dealings – unrelated and unknown to TCA and/or the Sadruddins.) The promissory note along with a new deed of trust on the Pikeville property

11

was again prepared by Ed Cagle's attorney Darrell Bridges and signed solely by Ed Cagle on behalf of both promissories. (The legality and effect of this transaction is currently being litigated in Bledsoe Chancery Court, Case No. 3343, and there remains the possibility that this property may yet be available for restitution.) On November 20, 2017, Whorisky wired $900,000 to the account of Cagle Development. ($500,000 of the $1.4 million was allocated - though not paid - to loan fees and Cagle's existing but unrelated debts to Whorisky referenced above.) The following day, Cagle Development wired $800,000 to Master Group's account, while retaining $100,000.

In total, Master Group shipped approximately 57,000 tarps to Puerto Rico before FEMA placed a stop order and terminated the contract in February 2018 for violating sourcing requirements. At all relevant times, the Sadruddins believed the tarps met all FEMA specifications *except* for provenance. According to FEMA however, the tarps failed to meet the thread thickness specifications – i.e., they were too thin. The thickness deficiency was unknown to the Sadruddins prior to federal product testing. Nevertheless, 29,000 tarps were used to mitigate property damage in the aftermath of Hurricane Maria, and another 28,000 are being stored on the island for future use. To their knowledge, no complaints have been otherwise made about the functionality or usefulness of the tarps, and the Sadruddins emphasize that they did not intend to deliver an out-of-specifications product and regret the error – though it appears the tarps' usefulness was never materially compromised.

*The Dissolution of the Pikeville Project*

Beginning in September 2017, the FEMA project had swallowed almost all of the parties' time and resources. Meanwhile, the Pikeville project had been badly neglected. Cagle had more projects he wanted to pursue, but the Sadruddins turned their attention back to Pikeville. They

found the renovation work at the Pikeville facility to be both less and inferior to what had been contracted, and on May 22, 2018, Attorney James McKoon filed a civil law suit in Bledsoe County Chancery Court on behalf of TCA and Master Group against Ed Cagle, his spouse Tammye Cagle, Whorisky Inc., and US Textile Sale, LLC. The complaint alleged numerous counts of fraud and civil wrongs regarding the parties' dealings surrounding the Pikeville project. The case remains pending. (This is the same lawsuit referenced above, i.e., Bledsoe County Chancery Court Case No. 3343.)

## Argument

**1.    A Variance is warranted under the § 3553 factors.**

***(a) The nature and circumstances of the offense and the history and characteristics of the defendants. (18 U.S.C.A. § 3553(a)(1)).***

There exist several mitigating circumstances of a kind and degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence below defendant's advisory guideline range of 70-87 months. *First*, the Sadruddins, after consulting counsel, began to immediately cooperate with federal and state authorities. Their cooperation led to the contemporaneous filing of an information and plea agreements – saving the government significant amounts of expense, time, and effort associated with a grand jury proceeding and trial. Such efforts exceed the mere acceptance of responsibility following an indictment.

*Second*, the Sadruddins have dedicated dozens of hours to cooperating with federal officials regarding their actions – as well as those of other persons of interest. The Sadruddins' actions include in-person meetings with federal agents, telephone conferences with federal agents, wearing a wire (Rahim only), recorded telephone conversations with persons of interest,

13

and providing relevant documents to federal agents. Whether or not the government files a U.S.S.G. §5K1 motion, nevertheless, defendants submit that their actions strongly support a downward variance. See, *United States v. Blue*, 557 F.3d 682, 686 (6th Cir. 2009); *United States v. Massey*, 663 F.3d 852, 858 (6th Cir. 2011); and *United States v. Gapinski*, 422 Fed.Appx. 513, 518 (6th Cir.2011).

*Third*, the Sadruddins have fully cooperated in returning proceeds and property in an effort to make victims whole. To date, *approximately* one million dollars ($1,000,000) has been returned to federal authorities and is available for restitution. Their efforts include the forfeiting of bank accounts, the sale of their personal residences, as well as the marketing and selling of the "FEMA" tarps to third parties - all under the supervision of the U.S. Attorney's office. Furthermore, they have worked assiduously to maintain their legitimate business concerns and have made payments totaling approximately $30,000 from their general revenue of their ongoing textile distribution business.

*Fourth*, the FEMA tarps were used and served the purposes of protecting property, including homes, in Puerto Rico. As stated above, at least 29,000 tarps were used to mitigate property damage in the aftermath of Hurricane Maria, and another 28,000 are currently being stored on the island for future use. While material thickness specifications were apparently not met, the Sadruddins were unaware of this deficiency. Furthermore, this deficiency has not materially affected their use and/or utility as evidenced by the tarps use and storage in Puerto Rico by federal officials and the federally supervised tarp sales to private third parties. The tarps that were used fulfilled their intended purpose and protected thousands of homes and belongings from further weather damage.

*Fifth*, while having committed all the described actions as alleged in the information, plea agreements, and pre-sentence investigation reports, the Sadruddins nevertheless stress that they always intended to open and operate a textile *manufacturing* facility in Pikeville - though admittedly on a smaller scale than represented in the grant proposal. Evidence of this intention is supported by, among other things, the TCA advertising/website which promoted their expected manufacturing capacity (Exhibit 6), their hiring of Raza Hussein, a long-time family employee who has extensive experience in project and contract management of industrial and commercial projects; the wiring of the Pikeville plant for machinery;[3] and the initial purchase and installment of sewing machines.[4]

The Sadruddins were also very aware that state and federal grants were predicated on TCA operating a manufacturing facility and that substantial efforts and progress would have to be demonstrated. Unfortunately, they believed that the perceived status of their associates, especially Ed Cagle and Troy King, would allow them a great deal of freedom as to how they used the grant money and the acceptable time table to bring the manufacturing facility on line. Nevertheless, they intended all along to operate a manufacturing facility.

*Sixth*, since initiation of this prosecution, Karim's and Rahim's mother Rozina has been diagnosed with Alzheimer's and dementia. Mr. and Mrs. Sadruddin currently live in Karachi, Pakistan. Mrs. Sadruddin is only 59 years old, and the family understands from her treating

---

[3] A federal agent has questioned the electrical capacity of at least some portions of the facility to handle the necessary machinery for a fully operating textile operation. The Sadruddins respectfully submit the wiring capacity was, in fact, sufficient and would have met applicable regulations and industry standards.

[4] Ten machines were purchased in or about November 2018 for $5,335. Of course, many more sewing, cutting, and other types of machinery would have been needed to bring the facility into full operation.

physician that this early onset often indicates a fast-progressing form of the disease. Consequently, Mansoor Sadruddin has almost completely retired from his businesses and has been personally providing much of her care at home. This situation has left the extended Sadruddin family in a much more precarious position – especially should the brothers be incarcerated and/or unable to continue their business.

*Seventh*, Karim's wife is now expecting their second child who is due October 13. During her first pregnancy, she suffered from sinus tachycardia and marginal cord insertion. Unfortunately, it appears from recent doctor visits as though the sinus tachycardia maybe recurring. Most recently, she saw Dr. Chandra, a heart specialist in Atlanta, who provided her a heart monitor. If these conditions do resurface, it is expected that she may be on bed-rest or limited activities after five-months – putting additional pressure and complications onto Karim's family.

*Eighth*, both Karim and Rahim are dedicated fathers and family men. They are both intimately involved in their children's education and extracurricular activities including sports, chess, and debate. Their children are currently thriving at school and home, and their fathers' presence is the best assurance of strong well-adjusted children and citizens.

### *(b) 18 U.S.C.A. § 3553(a)(2)(A-D) Factors.*

18 U.S.C. § 3553(a)(2) also enumerates the following factors to be considered by the Court:

> A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Neither of the Sadruddins have ever been convicted of a "crime" other than a traffic offense. Neither has served a day of jail. While both are generally physically and mentally healthy – neither is an imposing figure. The brother's arrests on federal and state felony charges, let alone the possibility of a prison term of 70-87 months, have shaken both brothers to their core. They are fearful for their physical safety[5] in prison and what will become of their family, including their parents, in their absence. In other words, the consequences already experienced by the Sadruddins have already "promote[d] [their] respect for the law," and they vow to never engage in illegal behavior again. They are most assuredly deterred from any subsequent violations of the law, and the public is not at further risk from either brother. (Subsections (A)-(C)). Furthermore, incarceration will not serve any of the possible benefits listed in subsection (D).

Based on the foregoing, the Sadruddins respectfully requests a substantial variance from their advisory guidelines up to and including a sentence of probation.

**2.      A Non-Prison Sentence is Appropriate in this Case**

The present case is unfolding during extraordinary times with a poorly understood pandemic causing havoc to the functioning of the judicial system and the incarceration of inmates. While the Sadruddins have now been vaccinated, infections within prisons are known to be high throughout the country, and it is unclear whether current vaccines will be as successful in preventing infection/symptoms as to the new variants being reported. Furthermore, Karim, like

---

[5] The Sadruddins are especially concerned in the event that they are housed for any period of time in a state or county facility where the threats of violence and intimidation are typically much greater. Defense counsel is personally aware of several incidents where defendants known or believed to have resources are targeted by inmates for extortion with threats and sometimes actual violence.

his brother, typically suffers from a yearly (acute) bronchitis episode during the winter months, which might exacerbate or render him more susceptible to Covid-19 or its symptoms.

Consequently, we have two brothers who, if allowed to continue to work (at least from home) during the pandemic, would stand a reasonable chance of repaying much of the actual losses over a reasonable period of time. They estimate that under expected business conditions they would be able to make total payments of *at least* $5,000 per month toward restitution. However, this ability to repay in the near and far future would likely be severely compromised with an extended term of imprisonment which would likely end their current business relationships - making full restitution more difficult and unlikely – despite best efforts. They therefore request that any prison term be met by home confinement.

## CONCLUSION

Based on the foregoing, the Sadruddins respectfully requests the following relief:

1. A substantial downward variance up to and in including a sentence of probation.
2. Judgement provisions allowing any prison term to be satisfied by home confinement with such reasonable conditions as the Court may impose.
3. In the alternative, judgement provisions which allow defendants to self-report to a designated federal facility and in the event that placement at a federal facility cannot be effected at the designated time because of extraneous circumstances (e.g., COVID-19) – that defendants be allowed to begin, and earn credit towards, his sentence with home confinement.
4. Defendants not be held in a state or county facility so as to avoid unnecessary risks posed by Covid-19 and physical violence/intimidation.

Respectfully submitted,

Spears, Moore, Rebman & Williams P.C.
By: s/*C. Eugene Shiles, Jr.*
    C. Eugene Shiles, Jr. (BPR 011678)
    Attorney for Karim Sadruddin
    601 Market Street, Suite 400 (37402)
    P. O. Box 1749
    Chattanooga, Tennessee 37401-1749
    Telephone #: (423) 756-7000

    DAVIS & HOSS, P.C.
    s/Lee Davis
    Lee Davis, TN BPR #15958
    Attorney for Rahim Sadruddin
    850 Fort Wood Street
    Chattanooga, TN 37403
    (423) 266-0605
    (423) 266-0687-fax

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2021, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

    s/*C. Eugene Shiles, Jr.*
    C. Eugene Shiles, Jr.
    TN BPR# 011678
    Spears, Moore, Rebman & Williams, P.C.
    601 Market Street, Suite 400
    P. O. Box 1749
    Chattanooga, TN 37401-1749
    Telephone: 423/756-7000